In the Matter of the Application of the CITY OF NEW YORK, Acting by and through the Commissioner of Docks, Relative to Acquiring Certain Property for the Improvement of the Water Front on the North River, between the North Side of West Forty-fourth Street and the Center Line of the Block between West Forty-seventh and West Forty-eighth Streets, etc.

CONSOLIDATED GAS COMPANY OF NEW YORK and Others, Appellants; THE CITY OF NEW YORK and Another, Respondents.

First Department, December 31, 1926.

Eminent domain — condemnation by city of New York of upland and land under water in Hudson river for water-front improvement — city deeded to predecessors of claimants, land under water extending to westerly line of Thirteenth avenue, as established by Laws of 1837, chap. 182 — city could not thereafter limit or abridge such grant — commissioners did not err in determining that use to which land was devoted was best use and in considering value of land and value of buildings separately — consequential damages to land not taken, which adjoined land taken, was properly allowed — no error in allowing nominal damages for cranage and wharfage rights on west side of Thirteenth avenue — commissioners properly allowed tenant value of buildings or plant and owner value of land — conjunctive value properly allowed — error to allow gas company cost of purging plant and for removal of material owned by it.

The Legislature, by chapter 182 of the Laws of 1837, laid out Thirteenth avenue in the Hudson river, 500 or 600 feet west of the line of Twelfth avenue, at the point where the land condemned in this proceeding for water-front development was located, and made the exterior line of Thirteenth avenue the permanent exterior line of the city of New York, and streets were extended to Thirteenth avenue, and land inside of the westerly line of Thirteenth avenue was conveyed in fee to the city of New York. In 1850 the city of New York conveyed to the predecessors in title of one of the claimants land under water extending to the westerly line of Thirteenth avenue. In the original grant the city conveyed all its interest in the land under water, *jus publicum* and *jus privatum*, and could not thereafter limit or abridge the rights thus conveyed without paying adequate compensation therefor, and statutes and ordinances passed after the original grant, purporting to limit or abridge the property rights of the grantee, impaired the contract made by the city with the grantee.

Accordingly, the court erred in holding that the commissioners should not have allowed for bulkhead rights or pier rights and in otherwise limiting recovery

by reason of laws and ordinances which attempted to qualify, abridge or limit the rights of the grantees.

The determination by the commissioners that the land on which a gas plant has been erected was devoted to the best use, in view of the condition of the neighborhood, and that the value of the land before the taking could be best ascertained by considering the land as vacant land and adding thereto the structural value of the improvements as actually in use, was proper.

The commissioners properly adopted, as their guide, that the rule controlling each award should be the constitutional requirement of just compensation, and that all other rules and all judicial precedents are but instances and illustrations of the application of the constitutional rule to specific situations.

It was not error for the commissioners to allow consequential damages for land not taken but which was affected by the taking of another parcel.

The commissioners properly allowed nominal damages only for the loss of wharfage and cranage rights on the west side of Thirteenth avenue, for that avenue was never constructed, and the enjoyment of such incorporeal rights was never possible, and, therefore, the value when appropriated by the city was purely nominal, and, furthermore, the right to construct bulkheads on the westerly side of Thirteenth avenue was destroyed by the action of the Secretary of War in establishing the line for solid filling east of that point.

The commissioners properly made an award to one claimant, as the owner of the property, and to his tenant for the buildings and plant erected thereon.

Conjunctive value was properly allowed in this case, since the claimant owned property on the water front back to a street, and directly across the street there was another plot which belonged to the same claimant.

It was error for the commissioners to make an award for purging the plant of a gas company after the taking and for the removal of materials owned by the gas company.

APPEAL by the Consolidated Gas Company and others from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 9th day of May, 1924, denying a motion to confirm the report of the commissioners herein and setting aside the awards of the commissioners of estimate for parcels 1, 2, 3, 4, 8, 11, 11-a, 12 and 12-a, upon the ground that the awards for said parcels were made by the commissioners of estimate upon erroneous principles and were excessive, and also from an order entered in said clerk's office on the 27th day of May, 1924, resettling the above-mentioned order.

The Consolidated Gas Company is claimant of damage parcels 1, 2, 3 and 4; Sumner Gerard, as sole surviving trustee under the will, etc., of Heyward Cutting, deceased, is the claimant of parcels 7 and 8; estate of Bradish Johnson, a corporation, is the claimant of damage parcels 11, 11-a, 12 and 12-a, and George J. Eltz, trustee in bankruptcy of D. Grieme Coal Company, a corporation, bankrupt, lessee of parcel 11-a, is the claimant of certain coal sheds, coal pockets and other structures on said parcel.

The court set aside a nominal award for parcel 7, because the

award was improperly grouped in a lump award with parcel 8, and returned parcel No. 7 to the commissioners with direction to make a separate award for parcel No. 7, but as to that parcel the opinion shows that the court practically confirmed the same.

As to the other parcels, which were set aside because of the commission of error, the court below returned the report to the same commissioners for a new trial in accordance with the principles set forth in the opinion of the court.

*Carl A. Mead* of counsel [*John A. Garver, Curtis A. Peters* and *Louis L. G. Benedict* with him on the brief; *Shearman & Sterling,* attorneys], for the claimant, appellant, Consolidated Gas Company.

*Nathan A. Smyth* of counsel, for Sumner Gerard, sole surviving trustee of the estate of Heyward Cutting, deceased, claimant, appellant.

*Spotswood D. Bowers* of counsel [*Stewart W. Bowers* with him on the brief; *Laughlin, Gerard, Bowers & Halpin,* attorneys], for the claimant, appellant, estate of Bradish Johnson.

*M. E. Kelley* of counsel [*Kelley & Connelly,* attorneys], for the claimant, appellant, George J. Eltz, trustee in bankruptcy of D. Grieme Coal Company.

*Henry W. Mayo* of counsel [*George P. Nicholson, Corporation Counsel*], for the respondent The City of New York.

*Richard T. Greene* of counsel [*Daniel S. Murphy* with him on the brief; *Greene & Hurd,* attorneys], for the respondent Empire Brick and Supply Company.

MARTIN, J. This proceeding was instituted by the city of New York on May 27, 1913, to acquire for improvement a section of the water front running from West Forty-fourth street on the south to the center line of the block between West Forty-seventh street and West Forty-eighth street. The easterly boundary of the property acquired coincides approximately with the original high-water line of the North river and is from 150 to 250 feet easterly from Twelfth avenue. The westerly boundary is Thirteenth avenue, which was laid out by chapter 182 of the Laws of 1837, but never filled in.

The Consolidated Gas Company owned the premises between West Forty-fourth and West Forty-sixth streets and also the property on the east adjacent to that taken and running nearly to Eleventh avenue on both blocks. This land had been filled in to a line approximately eighty-five feet west of Twelfth avenue, where a bulkhead was constructed. The property of the Consolidated Gas

First Department, December, 1926.                    [Vol. 219

Company embraced over one hundred and seventy-two city lots, nearly ten acres, of which an area equal to sixty-five lots, or three and seven-tenths acres, was originally upland. Forty-six lots, or about two and six-tenths acres, had been filled in by the grantees after the date of the grants; and sixty-one lots, or about three and five-tenths acres, were still under water. The portion taken, consisting of filled in land and land still under water, was about one hundred and seven lots.

On this land the Consolidated Gas Company had erected a water gas manufacturing plant, with an average daily capacity of 8,500,000 cubic feet. This was an operating plant of the most modern type and in excellent repair on August 1, 1913, the date when title vested.

The first hearing was held on September 30, 1913. The evidence was closed at the hearing on April 30, 1918. The property in its original condition was viewed by the commissioners on numerous occasions. The gas plant has now been entirely removed, and the property improved for the purpose for which it was taken.

The gas company claimed for this property, including land, land under water, bulkhead rights and gas plant, $3,313,205. The city conceded a value for the land, land under water and bulkhead rights taken, of $825,958, but contended that nothing should be allowed for the plant, asserting that it added nothing to the market value of the land, although it estimated the damage to the improvement, due to the taking, on the basis of structural value at $313,186.26. This, added to its estimate of the land value, totaled $1,139,144.26. The commissioners awarded the gas company a total of $2,272,808.41.

It was asserted by the gas company that, in making this award, the commissioners disallowed the following items of that company's claim:

1. They did not include a sufficient allowance for added value due to common ownership of a large parcel of land.

2. They allowed nothing for conjunctive value due to common ownership with the water front of the land more than 100 feet east of Twelfth avenue, although they allowed such conjunctive value as to the remainder of the land and water front property.

3. They fixed at too low a figure the unit values upon which they calculated the values of the upland.

4. They allowed for the plant only $1,016,329.09 instead of $1,313,205, claimed by the gas company, disregarding entirely elements of structural value aggregating nearly $295,000, consisting of interest on the land value during the period of construction, taxes on the value of the land and improvements during the period

of construction and a portion of the expense of the organization of the plant.

5. Although the remaining portion of the plant was rendered entirely useless for gas manufacturing purposes after the taking and all of the buildings and improvements were removed within a year thereafter, they found that seven buildings, constructed on the part of the plant not taken, possessed a value of $100,705.44 after the taking, although they were constructed only for gas purposes and there was no evidence that they were available for any other use.

Notwithstanding these deductions from its claims, the gas company moved to confirm the report, in the hope, it is said, which has not been realized, that the lower compensation fixed by the commissioners would be promptly paid by the city.

The title to the gas company's property is similar to that involved in *Appleby* v. *City of New York*, which this court has recently considered in 199 Appellate Division, 539, and which has been under consideration by the United States Supreme Court at a more recent date.

In 1837 the Legislature passed an act (Laws of 1837, chap. 182) laying out a new avenue in the Hudson river, 500 or 600 feet west of the line of Twelfth avenue at this point, and making the exterior line of Thirteenth avenue the permanent exterior line of the city of New York. The streets were extended to Thirteenth avenue and the land inside of the westerly line of Thirteenth avenue was conveyed in fee to the city of New York.

In 1850 the city of New York conveyed to the predecessors in title of the gas company all the land under water between the original high-water line and the exterior line of Thirteenth avenue, and between the center lines of West Forty-fourth and West Forty-sixth streets, saving and reserving from the grant the portions of West Forty-fourth, West Forty-fifth and West Forty-sixth streets and of Twelfth and Thirteenth avenues included therein for the uses and purposes of public streets, avenues and highways.

These grants contained the usual covenants that the grantee would fill in the streets and avenues within three months after being required to do so, but that they would not fill them in unless permitted to do so by the city. The grants recited the receipt of a money consideration aggregating $5,228.25.

The gas company and its predecessors in title have never been required to fill in the streets and avenues. On December 28, 1853, an ordinance, passed by the common council, was approved by the mayor, expressly giving to the predecessor in title of the gas company, his heirs and assigns, permission to construct the

First Department, December, 1926.                    [Vol. 219

streets and avenues and to fill in all the land under water conveyed by the grants.

In 1857 the Legislature passed an act (Laws of 1857, chap. 763) establishing bulkhead lines for the port of New York. Between West Forty-fourth and West Forty-sixth streets this bulkhead line crossed the land under water conveyed by the grants parallel with and 100 feet west of Twelfth avenue. The act also established pierhead lines and prohibited solid filling outside the bulkhead lines as well as the construction of piers outside the pierhead lines; and it provided that no piers should be constructed more than 70 feet wide or having intervening water spaces of less than 100 feet.

In 1860 the Legislature passed an act (Laws of 1860, chap. 522) which prohibited filling in and creation of structures beyond the bulkhead line of 1857.

By chapter 331 of the Laws of 1865, the act of 1837, establishing Thirteenth avenue as the exterior line of the city, was amended, and the grants of lands under water theretofore made by the State to the city were expressly confirmed. Pursuant to this act of 1865, the city of New York on November 5, 1870, thirteen years after the act of 1857, executed to the predecessor in title of the gas company a grant expressly confirming the three grants of 1850.

In the year 1871 the dock department of the city of New York was created, with power to adopt new plans for the improvement of the water front (Laws of 1871, chap. 574). Pursuant to this power, the dock department, in April, 1871, adopted a new plan for this portion of the water front, by which the bulkhead line was placed 150 feet west of Twelfth avenue, instead of 100 feet, as provided by the act of 1857. At some time thereafter the city of New York erected piers on its land under water in West Forty-fourth, West Forty-fifth and West Forty-sixth streets, thereafter having access from the water to the sides of those piers over the adjacent land under water belonging to the gas company.

About the year 1877 the gas company filled in its land to a line about eighty-five feet west of the westerly side of Twelfth avenue and constructed a crib bulkhead thereon pursuant to the permission granted in 1853. It then proceeded to erect its gas plant on the land owned by it. It transported the coal required at the plant over the bulkhead by means of a trestle, and the oil and water for condensers by means of pipes through the bulkhead, removing over the bulkhead the ashes and other refuse of the plant.

Until the year 1890 the Federal government had made no regulations in regard to the use of this waterfront; but in that year the Secretary of War, acting under the authority of the act of Congress of August 11, 1888, laid out pier and bulkhead lines

for this locality, which coincided with the lines established by the dock department of the city of New York in 1871; and in 1897 the Secretary of War laid out a new pierhead line at this point, 700 feet west of the bulkhead line of 1890.

On April 30, 1913, the city of New York adopted a new plan for this portion of the waterfront, removing the bulkhead line inland approximately 150 to 250 feet east of Twelfth avenue, practically to the original high-water line. By this new plan the existing city pier, 100 feet wide at the foot of West Forty-fourth street, was widened and extended 35 feet to the northward, over the land under water belonging to the gas company. Likewise there was laid out a new pier at the foot of West Forty-sixth street, 150 feet wide, of which 66 feet 8 inches was over land of the gas company, with an intervening slip 360 feet wide.

Parcel 1, belonging to the gas company, consisted of the block between West Forty-fourth and West Forty-fifth streets, west of Twelfth avenue. Parcel 3 was a similar block between West Forty-fifth and West Forty-sixth streets, west of Twelfth avenue. Each of these blocks had been filled in to a distance of about eighty-five feet west of Twelfth avenue, the remaining sixty-five feet to the east of the Federal bulkhead line and the entire portion west of that line never having been filled in.

Damage parcel No. 2 consists of the block on the easterly side of Twelfth avenue from West Forty-fourth to West Forty-fifth streets, running eastwardly on the northerly side of West Forty-fourth street 158.68 feet and on the southerly side of West Forty-fifth street 194.94 feet. Damage parcel No. 4 consists of the block on the easterly side of Twelfth avenue from West Forty-fifth to West Forty-sixth streets, running eastwardly on the northerly side of West Forty-fifth street 205.77 feet and on the southerly side of West Forty-fifth street 234.48 feet.

The commissioners found that parcels 1 and 3, east of the Federal bulkhead line, could be completely filled in whenever desired, and they made substantial awards for the portions of these parcels east of that line, filled and unfilled, each 150 feet by 200 feet, 10 inches, and containing over 30,000 square feet.

The city of New York contended that no piers could have been erected on parcels Nos. 1, 3 and 11, because the consent of the city had not been and could not be obtained for the erection of such piers under the sinking fund ordinances of 1844; that the claimants as to parcels Nos. 1, 3 and 11 could not have erected a pier on any portion of said parcels because such pier would have come nearer than 100 feet to the city's piers at the foot of West

3

Forty-fourth, West Forty-fifth, ·West Forty-sixth and West Forty-seventh streets; that the erection of such piers would have violated existing provisions of the law, and that no pier could have been erected nearer than 100 feet to an existing pier.

In order to avoid repetition, the legal principles applicable to these and other similar claims will be referred to later.

The claims of the estate of Bradish Johnson, a domestic corporation, which appeared in this proceeding, include title to parcels Nos. 11, 11-a, 12 and 12-a, and are in many. respects like those of the gas company. The title to this property was derived through grants similar to the above-described grants.

Objections similar to those urged by the city to the claims of the gas company have been urged to the claims of the estate of Bradish Johnson. It is sufficient to say that they are substantially the same and that the law applicable to the claims for bulkhead rights, pier rights, filled-in land, and land under water applies with equal force to all of these claims. Many of the contentions made by the city of New York with respect thereto are fully disposed of by the decisions of the Supreme Court of the United States in *Appleby* v. *City of New York* (271 U. S. 364); *Appleby* v. *Delaney* (Id. 403) and the decision of the Court of Appeals in *Duryee* v. *Mayor* (96 N. Y. 477).

It is conceded that the grants in the *Appleby* cases are similar to the grants here under consideration. The United States Supreme Court there held that the city of New York had no right to limit or abridge such grants by regulations having the effect of depriving the owners of the land of the right to use same as water front properties. As a result, it becomes unnecessary to consider many of the points urged in the briefs, the *Appleby* cases being final authorities to the effect that the chief contentions of the city of New York are without merit.

A few excerpts from these cases may be of assistance in disposing of this matter. In *Appleby* v. *City of New York* (271 U. S. 364, 391) the court said: " If we are right in our conclusion as to the effect of these deeds under the law of New York at the time of their execution, then there can be no doubt that the laws of 1857 and 1871 as enforced in this case impair the contract made by the city with the grantees of these deeds."

Speaking of the extent of the grants the court (at p. 396) said: " The suggestion that rights of ownership in lands under ‚ water conveyed by the city, by such a deed in fee simple, are restricted, and the city's control of navigation of the water over them remains complete until they are filled, cannot be accepted without qualification in respect of grants which are intended to part both with

the *jus publicum* and *jus privatum*, as we have found these deeds to do. The suggestion does not find support in the case of *First Construction Company of Brooklyn* v. *State*, 221 N. Y. 295, cited to sustain it. In that case, Beard was an upland owner whose land bordered on Gowanus Bay. The Legislature in three acts granted to a private person the right to build wharves and fill in lands in a salt meadow marsh and mud flats partially submerged at high tides. The court, HISCOCK, C. J., in stating the case, said, p. 303: ' It may be stated generally that none of them [the legislative acts] did more than grant to Beard and others the privilege to build wharves, etc., and fill in lands; none of them purported in terms to grant and convey the title to lands under water included within the area now appropriated, and none of them was passed by a two-thirds vote.' "

With reference to the right of wharfage (at p. 399), the court said: " Our conclusions are that Appleby and Latou were vested with the fee simple title in the lots conveyed, and with a grant of the wharfage at the ends of the lots on the river; that with respect to the water over those lots and the wharfage, the State and the city had parted with the *jus publicum* and the *jus privatum;* and that the city can only be revested with that by a condemnation of the rights granted."

In deciding that the owners had a right to fill in these lots, the court (at p. 400) further said: " The filling was left to their convenience. They were not in default with reference to filling in the streets and avenues, because their covenant to do so was only on condition that the city should require it, and only when it did so. The reason for their delay in filling the remainder of the lots beyond 12th avenue was doubtless due to the passage of the act of 1857 and of the act of 1871, and their reasonable expectation that the city would condemn their rights — an expectation that was confirmed by the condemnation proceeding which was directed to be begun in 1890 by the Dock Commission, and was begun in 1894, and remained without prosecution, and operated as a dead hand upon this property for twenty years until 1914, when the city discontinued it. Thereupon this suit was promptly brought."

Speaking of the bulkhead rights and the Secretary of War's order with reference to same (at pp. 401, 402) the court said: " The only just and possible result of the Secretary of War's order is that the enjoyment by the plaintiffs of their rights under the deeds is qualified to the extent of a compliance with it, without conferring any affirmative power upon the city to detract from the rights which it had granted. The plaintiffs are prevented from solidly filling between the bulkhead line and 13th avenue; but the

First Department, December, 1926.                    [Vol. 219

order expressly authorizes the substitution for such filling of the construction of piers on piling driven into the lots of the plaintiffs. To whom is given the right to build piers over these lots? The Government does not attempt to take it away from the owners of the lots. It does not attempt to vest it in the city. It could not do so if it would. The right must reside in those who have the ownership of the land under the water and who, until the Secretary had made his order, were entitled by their grants to use the solid filling up to the line of 13th avenue, with reference to the bulkhead lines or to the 100 feet spacing between the piers under the acts of 1857 or 1871.

" The lots have been bought and paid for subject only to control by the General Government in the interest of navigation. The General Government, through its agent, says it does not require open water for navigation, but is sufficiently satisfied by piers on piles extending over the water. The city has by deed granted to the Applebys the wharfage and cranage rights upon these lots. What is there to prevent the Applebys, by the construction of piers on piles over their lots, in conformity to the Secretary of War's order, from enjoying the profit from that wharfage? "

Taking, therefore, the *Appleby* cases as a basis for this decision, it follows that the court at Special Term erred in holding that the commissioners should not have allowed for bulkhead rights or pier rights, and in otherwise limiting recovery by reason of laws and ordinances which attempted to qualify, abridge or limit the rights of the grantees.

It will be necessary as a result of that decision to reinstate many of the items disallowed by the court at Special Term.

That court also held that the commissioners erred in allowing values based upon the fact that the land might be used for other purposes. The commissioners distinctly stated that, while evidence to that effect had been admitted, nevertheless the property should not be valued as available for railroad or other purposes, but should be and was valued upon the theory, which the commissioners deemed supported by the evidence, that the use to which it was devoted was the best use in fact to which, at the time of the taking, it could be devoted; that the structures thereon in use were adequate improvements, considering the prevailing condition in the neighborhood and the prevailing demands and uses to which such property could be reasonably devoted, to develop its best obtainable market value; and that such value before the taking could be best ascertained by considering the land as vacant land, and adding thereto the structural value of the improvements as actually in use.

The method used by the commissioners in ascertaining the

damages herein was approved in *Matter of City of New York* (198 N. Y. 84), where the court held that when buildings have an intrinsic value which must be added to the value of the land in order to ascertain the value of the whole, the owner may prove the value of his land and the value of his buildings separately and the latter may be established by the cost of reconstruction after proper deductions for wear and tear.

In *Matter of Mayor* (*Consolidated Gas Co.*) (39 App. Div. 589) the headnote concisely states the law here applicable, as follows: " Where a portion of a tract of land, taken under the power of eminent domain, is, together with the buildings thereon, necessary for the purposes of a gas plant to which the entire tract is devoted, the owner's measure of damages is not only the value of the land taken, but also the difference between the value of the plant as it was before the taking and its value after the taking."

The course adopted by the commissioners governing this entire proceeding was stated substantially as follows: That the rule controlling each award should be the constitutional requirement of just compensation; and that all other rules and all judicial precedents are but incidents and illustrations of the application of the constitutional rule to specific situations. The authorities state the same rule in varying terms.

In *Matter of City of New York* (*State Ice Manufacturing Corp.*) (213 App. Div. 187, 190) this court said: " The award is to be made for the fair market value for all available uses and purposes. It is true, too, that market value includes every element of usefulness and advantage in the property, if it possesses advantages of location or is available for any useful purpose whatever."

In *Matter of Daly* v. *Smith* (18 App. Div. 194, 197) the court said: " It is doubtless true, and settled by authority, that the landowner is not limited in compensation to the use which he makes of his property, but is entitled to receive its greatest value for any purpose."

In *Matter of City of New York* (198 N. Y. 84, 88) the court said: "When the State compels a man to give up his land for public use, and permits him to recover, not what he thinks it is worth, but only its fair market value, he should at least have the right to prove every element that can fairly enter into the question of market value."

Inasmuch as it thus appears that no erroneous principle was adopted by the commissioners, and as it is not claimed that any material feature of the case has been overlooked, or that they were influenced by prejudice or passion, their findings, in accordance with the law as announced by this court, should not be dis-

First Department, December, 1926. [Vol. 219

turbed. (*Matter of Corporation Counsel, etc.,* 188 App. Div. 668, 671.)

It is also contended that consequential damages for land not taken, but which was affected by the taking in parcel No. 8, should not have been allowed.

The grounds for this award were stated by the commissioners as follows:

" The award to the owners of damage parcel 8 should include the consequential damage to the property remaining in the same ownership.

" In valuing such property remaining after the taking, it should be considered that the right of access directly to the water front was cut off, and no offset should be allowed for the purposes to which the property taken is to be devoted; there is no evidence that such use would confer a benefit, or of the value of any benefit so conferred; and whether any benefit would be conferred is both problematical and doubtful, and it added nothing to the value of the property remaining.

" In valuing the property in such ownership remaining after the taking, its fair market value after the taking should be ascertained by considering that after the taking it consisted of a parcel fronting on 46th street extending beyond the center line of the block; this extension should be considered in the alternative either as an extension of 46th street lots, or as available for rear portions of lots fronting on 47th street; and so considered, the greater of the values arising from considering the two methods of possible use should be deemed the fair market value after the taking.

" So considered the method shown in our award results in the greater value:

" The claimants on account of damage parcel 8 suffered consequential damage in the impairment of the value of their property adjoining said parcel on the east within the green lines on the Commissioners' damage map to the extent shown in the calculation accompanying our award."

It appears that none of the criticisms of this award made by the court at Special Term can be sustained. The award of the commissioners being based on correct principles should be upheld.

The next question involved is the allowance for parcel No. 7. All of damage parcel No. 7 on August 1, 1913, was land under water. Twelfth avenue had not been filled in between parcel No. 8 and parcel No. 7. The commissioners' award of nominal damages only, was proper — in disposing of the claim made for damages to parcel No. 7 they said:

" The rights to collect wharfage and cranage mentioned in the

said grants of land under water were incorporeal hereditaments having a fixed location upon the west side of the Thirteenth Avenue there mentioned.

" As such avenue was never constructed the enjoyment of such incorporeal hereditaments was never possible and the value thereof on August 1, 1913, was purely nominal.

" Bulkheads on the westerly side of Thirteenth Avenue as mentioned in the grants of land under water from the City of New York were the sole bulkheads, if ever constructed, which would have been subject to the public rates for wharfage and cranage; but such bulkheads were never constructed and all right to construct them had ceased before August 1, 1913, by reason of the establishment of the line for solid filling by the Secretary of War on April 25, 1890.

" The restrictions and public use to which such bulkheads located upon the westerly side of a public avenue might have been subjected, did not apply to physical bulkheads, or the right to construct physical bulkheads upon private property embraced within the grants of land under water from the City of New York."

The commissioners made an allowance for the plant of the D. Grieme Coal Company, taken by the city. The court at Special Term set aside this award. It is not disputed that the city took this plant. It is apparent that the court refused to confirm the award on the ground that the coal plant was not an adequate improvement and that it did not increase the value of the land.

The appellant contends that the question of the adequacy of the improvements on the leased land was not involved. The landlord was given the value of the unimproved land and the tenant the value of the plant. The award was made for the plant as a going concern, which was taken from its owner by the city and disposed of for its own benefit.

The claimant placed the value of the property at $26,000. The experts for the city valued it at $11,735.45, and the commissioners made an award of $16,673.45.

When there is a condemnation of land and also a destruction of a valuable plant erected by a tenant thereon, the value of the plant, even though not adding to the value of the land, must be awarded to the tenant. It is proper for the commissioners to make separate awards not only for the fee of the land, but to the lessee who has erected business buildings and a plant thereon. (*Matter of City of New York* [*North River Water Front*], 118 App. Div. 865; *Matter of City of New York*, 192 N. Y. 295; *Jackson* v. *State*, 213 id. 34; *Matter of City of New York* [*Pier Old No. 49*], 227 id. 119; *People ex rel. Kings County L. Co.* v. *Willcox*, 210 id.

479; *Gamble* v. *Queens County Water Co.*, 123 id. 91.)  It is apparent, therefore, that this award was proper and should be reinstated.

It is also argued by the city that the court should not have allowed conjunctive value.  There are instances where conjunctive value is a very proper allowance.  This case clearly demonstrates that fact.  The theory of conjunctive value applied herein is that where property is owned upon a water front back to a street, and directly across the street another large plot is owned by the same owner, conjunctive value should be allowed.

In *Matter of City of New York* (213 App. Div. 187, 190) this court said: " It would seem that since appellant's bulkhead rights were not only appurtenant to the upland but were part and parcel thereof and that they were necessary to the fullest enjoyment of the upland as a frontage on a street, the claimant would have the right to have his consequential damages fixed to the upland property by reason of its availability for conjunctive use with the bulkhead taken.  Such use undoubtedly enhances the value of both the property and the easements, and since it is impossible to determine what that value is, because evidence thereof was excluded, the final decree fixing damage in that respect should be reversed."

There was no error, therefore, in allowing conjunctive value under the special circumstances here shown.  While conjunctive value may be allowed in exceptional cases only, nevertheless it was properly allowed here.

The commissioners allowed two comparatively small items (considering the large amount involved), one for purging the plant after the taking and the other for the removal of materials owned by the gas company.

From an examination of this record, we are convinced that these items should not have been allowed and that there is no basis for their allowance in this condemnation proceeding.  The total amount is $6,152.24.  It is not necessary, however, to return this decree for revision because we have decided to disallow these two items, one for $1,161.93, the cost of purging the plant, and one for $4,990.31, the cost of removal of supplies of gas and oil.

Several awards have not been considered in this opinion for the reason that they were returned to the commissioners by the court at Special Term and no appeal was taken.

Specific reference has not been made to other claims asserted herein, such as the claim for the apportionment of rents with reference to the Empire Brick and Supply Company award. Nevertheless, they have all received consideration by the court.

It would serve no useful purpose to take up separately each item allowed by the commissioners and disallowed by the court

at Special Term. To do so would unduly prolong this opinion. The *Appleby* cases having disposed of nearly all of the contentions made by the city, as well as most of those urged by the court in setting aside the awards, and having so clearly and concisely stated the law governing the subject, it seemed to us sufficient for the purpose of this opinion to set forth briefly the principles there stated.

Although this case has many important features, it finally resolves itself, in many instances, to a question of value, which depends for its determination so largely upon the opinion of men, that the award should not be set aside except for the most cogent reasons. It has been pending for about thirteen years, but this court is not responsible for any delay.

For the foregoing reasons the order setting aside the award of the commissioners should be reversed, with ten dollars costs and disbursements, and the awards reinstated in all respects so far as appealed from, except as to item amounting to $4,990.31, for removing supplies from the plant by the Consolidated Gas Company after title had vested, and the item amounting to $1,161.93, cost of purging gas plant after title had vested.

CLARKE, P. J., DOWLING, FINCH and McAVOY, JJ., concur.

Order reversed, with ten dollars costs and disbursements, and awards reinstated in all respects, so far as appealed from, except as to item amounting to $4,990.31 for removing supplies from the plant by the Consolidated Gas Company after title had vested, and the item amounting to $1,161.93, cost of purging gas plant after title had vested. Settle order on notice.